RANDY S. GROSSMAN
Acting United States Attorney
MICHAEL A. DESHONG
California Bar No. 301041
DANIEL C. SILVA
California Bar No. 264632
CARL F. BROOKER
Washington D.C. Bar No. 1022908
Assistant United States Attorneys
Federal Office Building
880 Front Street, Room 6293
San Diego, California 92101-8893
Telephone: (619) 546-9290/9713
Email: michael.deshong@usdoj.gov

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.  21-cr-2120-JLS |
| Plaintiff, | **UNITED STATES OF AMERICA'S SENTENCING MEMORANDUM** |
| v. | |
| GPOMCT GRUPO EMPRESARIAL S.A. DE C.V., | Date: November 15, 2021<br>Time: 9:00 a.m. |
| Defendant. | **Hon. Janis L. Sammartino** |

The plaintiff, UNITED STATES OF AMERICA, by and through its counsel, RANDY S. GROSSMAN, Acting United States Attorney, Michael A. Deshong, Daniel C. Silva, and Carl F. Brooker, Assistant United States Attorneys, hereby files its Sentencing Memorandum which is based upon the files and records of this case.

In accordance with the plea agreement, the United States recommends that the Court impose a sentence on Defendant of a forfeiture of $1,100,000; no fine; three years' probation; and a special assessment of $400.

**I.    STATEMENT OF THE CASE**

On July 29, 2021, the United States filed a single-count Information charging Grupo Empresarial S.A. de C.V. ("GPOMCT") with operating an unlicensed money

transmitting business, in violation of Title 18, United States Code, Section 1960. ECF No. 1. On the same day the Information was filed, Defendant entered a Plea Agreement admitting its violation of Title 18, United States Code, Section 1960. ECF No. 4. The Plea Agreement included a forfeiture addendum, wherein the parties agreed to the forfeiture of $1,100,000. ECF No. 4 at 12–15.

Within the Plea Agreement, Defendant waived the right to appeal and to collaterally attack every aspect of the conviction and sentence, including forfeiture; except those based on a claim that Defendant received effective assistance of counsel. Plea Agreement, at XI.

## II. STATEMENT OF RELEVANT FACTS

### A. Background

In 2010, the Mexican Finance Ministry, *Secretaria de Hacienda y Credito Publico de Mexico* (SHCP), published anti-money laundering regulations that restricted the amount of physical U.S. currency that Mexican banks could receive. Around the time these new regulations were issued, the Financial Crimes Enforcement Network (FinCEN) issued an advisory information stating that while there were many legitimate reasons for U.S. currency to enter the Mexican economy, "a significant portion of the U.S. currency in Mexico is derived from illegal activity, specifically the sale of narcotics in the United States, some of the proceeds of which are smuggled as bulk cash into Mexico." Newly Released Mexican Regulations Imposing Restrictions on Mexican Banks for Transactions in U.S. Currency, FIN-2010-A007 (June 21, 2010). The advisory opinion went on to put U.S. financial institutions on notice that U.S. financial institutions should adjust their anti-money laundering activity accordingly to monitor for increases in activity involving U.S. currency that may be indicative of criminal activity.

In other words, Mexico's anti-money laundering restrictions prevented U.S. dollars in Mexico from being integrated into the Mexican financial system. This created a need for individuals in Mexico that possessed large amounts of U.S. currency—whether

acquired legitimately or otherwise—to convert their U.S. dollars into Mexican pesos. This is a need that GPOMCT attempted to meet.

### B. GPOMCT Used the United States Financial System to Run Its Business

GPOMCT is a Mexican company. GPOMCT acts as a type of holding company comprised of five different exchange centers (*centros cambiarios*) located in Tijuana, Mexico. These five exchange centers have a total of approximately 42 branches in Mexico. While many Mexican houses of exchange would be hindered by the inability to deposit U.S. dollars into their bank accounts, GPOMCT gained a competitive advantage over other Mexican currency exchanges by converting large amounts of U.S. dollars to Mexican pesos for its customers then importing its U.S. dollars back into the United States.

As GPOMCT accumulated U.S. dollars in Mexico, it began using the services of two armored car companies, Armored Car Company 1 (ACC 1) and its Mexican affiliate, ACC 1-Mex, to import large shipments of U.S. dollars into the United States and transport the currency to third parties. ACC 1-Mex drove these shipments of currency across the border into the United States and delivered them to ACC 1 to complete delivery to third parties within the United States. These third parties then converted the U.S. dollars to Mexican pesos and wired the funds back to GPOMCT in Mexico. Between January 7, 2019 and February 4, 2021, GPOMCT used the services of ACC 1-Mex—often in coordination with ACC 1—to import approximately 238 shipments of U.S. dollars into the United States in this manner. These shipments totaled approximately $250,000,000 USD.

GPOMCT moved these large sums of money through the United States without ever registering with the Secretary of Treasury as a money transmitting business / money services business or obtaining authorization to conduct business in the United States.

### C. GPOMCT Acted as a Wholesale Currency Dealer in the United States

In addition to moving its U.S. dollars through the U.S. financial system, GPOMCT also began acting as a wholesale currency dealer by selling Mexican pesos to a currency

3

exchange in San Ysidro, California, which is identified in the plea agreement as Money Services Business 1 (MSB 1). Since MSB 1 began its operations in or about September 2019, GPOMCT operated as its wholesale currency dealer by delivering shipments of Mexican pesos, valued between $90,000 to $100,000 USD, to MSB 1 in San Ysidro, California multiple times each week.

From approximately September 2019 to around March 2020, the owner of GPOMCT, members of his family, and other managers, employees, and agents of GPOMCT personally imported numerous such shipments of Mexican pesos belonging to GPOMCT and delivered those funds to MSB 1. Between September 2019 and September 1, 2020, these individuals completed Currency Monetary Instrument Reports (CMIRs) that declared the importation of Mexican pesos by GPOMCT and delivery to MSB 1 in San Ysidro, California. Between September 13, 2019 and September 16, 2020, GPOMCT sold Mexican pesos to MSB 1 in approximately 195 different transactions. These transactions had an aggregate value of approximately $20,000,000 U.S. dollars.

In fairness, there is no direct evidence that GPOMCT ever intentionally or knowingly processed criminal proceeds as part of its business. This prosecution is about GPOMCT using the U.S. financial system to process large amounts of currency that were at high risk for including criminal proceeds without registering as a financial institution in the United States or complying with U.S. anti-money laundering or reporting requirements in order to gain a competitive advantage over its competitors.

### III.   GUIDELINES CALCULATION

#### A.   Total Offense Level

Base Fine Calculation

| | |
|---|---|
| Base Offense Level [USSG § 2S1.3(a)(2)] | 6 |
| Value of Funds Transmitted (Greater than $9.5M) [USSG §§ 2S1.3(a)(2) and 2B1.1(K)] | +20 |
| Acceptance of Responsibility [USSG § 3E1.1] | -3 |

Culpability Score

| | |
|---|---|
| Base Level [USSG § 8C2.5(a)] | 5 |

| | |
|---|---|
| Organization with 50+ Employees and Person with Substantial Authority Participated [USSG § 8C2.5(b)(4)] | +2 |
| Reduction for Acceptance [USSG § 8C2.5(g)(2)] | -3 |
| Combination of Circumstances [USSG § 5K2.0] | -2 |

The United States requests that Defendant receive a 3-level downward adjustment under USSG § 3E1.1(a) and for its acceptance of responsibility—and a similar adjustment to its culpability score. The United States requests that Defendant further receive a 2-level downward adjustment pursuant to USSG § 5K2.0 for a combination of circumstances that are present to a substantial degree, but not entirely or adequately taken into consideration by the USSG. The first circumstance is that Defendant entered into the Plea Agreement at an early stage of this investigation, during the Covid pandemic, all while the investigation continues. The second circumstance is that the underlying facts of Defendant's MTB operations, and the specific nature of the international transactions, extends a series of prosecutions in the Southern District of California that sends a significant deterrent message throughout the Southwestern United States.

### B. Fine

Title 18, United States Code, Section 3571(b)(3) caps the maximum fine for this offense at $500,000. The Guidelines lay out factors the Court should consider when imposing a fine, including the need for the combined sentence to reflect the seriousness of the offense and promote respect for the law. USSG § 5E1.2(d). The United States recommends that this Court not impose a fine on Defendant in light of the $1,100,000 forfeiture.

## IV. TITLE 18, UNITED STATES CODE, SECTION 3553 FACTORS

The ultimate sentence must be sufficient, but no greater than necessary, to satisfy the purposes and factors set forth in Title 18, United States Code, Section 3553(a). While the Court has an obligation to consider the Guidelines, the USSG calculation is simply one factor when determining an appropriate sentence. *United States v. Booker*, 534 U.S. 220, 257 (2005). Nothing in Section 3553 suggests that the Guidelines are to be given any greater weight that their fellow sentencing factors. *United States v. Zavala*, 443 F.3d

1165, 1171 (9th Cir. 2006). Instead, the Guidelines act as a "starting point" for the District Court." *United States v. Cantrell*, 433 F.3d 1269, 1280 (9th Cir. 2006).

### A. The Nature and Circumstances of the Offense and the Characteristics of the Defendant

Defendant operated an unlicensed MTB in the United States by operating a large network of currency exchanges in Mexico and running all the U.S. dollars it accumulated through the U.S. financial system, and selling Mexican pesos to a U.S.-based currency exchange (MSB 1). As an unlicensed money transmitting business, Defendant failed to maintain an adequate anti-money laundering program to detect, report, and discourage Defendant's conduct, or otherwise to conduct due diligence into the nature and purpose of its MTB operations. The failures of other third-parties are not mitigating factors in Defendant's offense. Rather, these show that Defendant and its extended network of agents exploited the lax, limited, or otherwise ineffective compliance by other financial institutions.

Defendant has accepted responsibility for its violations and produced records of its international transactions. This is a relevant factor for the Court to consider when weighing the nature and circumstances of offense and history and characteristics of a defendant. *United States v. Huerta*, 878 F.2d 89, 93 (2d Cir. 1989).

### B. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and to Protect the Public

The proposed sentence will ensure that Defendant appreciates the seriousness of its conduct, and the harm it caused the global financial system, specifically the specific risks inherent to MSBs on the U.S.-Mexican border. There is, however, limited ability for the sentence to protect the public. Defendant has no criminal history, and should have no reason to continue facilitating, and profiting from, unlicensed MTB transactions. The guilty plea and the reasonable forfeiture should send a significant deterrent message to other similarly-placed entities and individuals about the need to comply with the Bank Secrecy Act.

    **C.    The Need for the Sentence Imposed to Afford Adequate General Deterrence**

A sentence within the Guidelines range will deter other businesses and individuals engaging in similar unlicensed MTB conduct. This is particularly important for individuals operating MTBs that provide currency delivery services to customers throughout the United States yet who still have foreign operations. Law enforcement throughout the world is beginning to recognize the breadth and threat that these unlicensed transmitting networks pose to the financial system. And though the funds here were not demonstrably proceeds of other underlying, and potentially more concerning, crimes, it is not difficult to envision how easily criminal organizations could exploit unlicensed MTBs like Defendant's, or even operate their own, to launder unlawful proceeds of crime.

    **D.    The Need to Avoid Unwarranted Sentencing Disparities**

Defendant pleaded guilty during a pandemic. There are few other recent corporate resolutions in the Southern District of California, or elsewhere, that would render the proposed sentence disparate.

**V.    CONCLUSION**

For the reasons stated above, the United States recommends that the Court impose a forfeiture of $1,100,000; no fine; three years probation, and a special assessment of $100.

DATED: November 8, 2021        Respectfully submitted,

                                            RANDY S. GROSSMAN
                                            Acting United States Attorney

                                            *s/ Michael A. Deshong*
                                            MICHAEL A. DESHONG
                                            DANIEL C. SILVA
                                            CARL F. BROOKER, IV
                                            Assistant U.S. Attorneys